## WILLIAM McCULLAGH v. SAMUEL L. ALLEN.

1. MOTION FOR NEW TRIAL; *Practice.* When a motion for a new trial is filed it becomes a part of the record, and it is not necessary to incorporate it in a bill of exceptions.

2. RECORD; *Journal Entries.* Where a jury is waived and the cause is tried by the court, and special findings of fact and conclusions of law are made, and not signed by the judge, but by order of the court are spread upon the journal, such findings and conclusions are a part of the record.

3. INDIAN TITLES; *Laws of Descent; Ottawas.* The clause of art. 9, of the Treaty of 1831 between the United States and the Ottawa tribe of Indians, whereby the United States guarantee that the lands reserved to the Ottawas shall never be within the bounds of any state or territory, is abrogated by the provisions of the treaty between the same parties of July 16, 1862.

*Error from Anderson District Court.*

ACTION by *McCullagh* upon covenants for title. The opinion of the court contains a statement of the proceedings sufficient to an understanding of the questions of practice decided, and a full statement of the facts upon the merits. The case was tried at the August Term 1871 of the district court. The court found in favor of defendant *Allen,* and the plaintiff brings the case here by petition in error.

*C. B. Mason,* and *W. H. Clark,* for plaintiff in error:

1. The court erred in its finding that the title by descent of Indians on the Ottawa reservation was general by the rule of the common law until the treaty of 1867, (15 Stat. at Large, 517.) The treaty of 1862, (12 Stat. at Large, 1237,) takes precedence of the treaty of 1867 in abrogating the treaty of 1831, (7 Stat. at Large, 361.) The laws of the state of Kansas attached as soon as the treaty of 1862 was concluded. By operation of law, the sale of lands and issuing of patents in fee simple to settlers under article 9 of the treaty of 1862, the control of the territory of the Ottawa Indian reservation was converted to the state of Kansas. It is a substantial consent of the Indians, and takes the Ottawa lands out of the

operation of the treaty of 1831, and out of the purview of § 19 of the organic act of the territory of Kansas. By the first article of the treaty of 1862 the Ottawa Indians to all intents and purposes in law became as aliens, and liable to become citizens of the state of Kansas as other aliens by their own consent, and made no reservation whatever. Under § 17 of the Kansas bill of rights, the law of descent of the state is applicable, and the title of Sears, derived from the husband, is paramount to the title derived from the defendant.

2. The deed from David McNab, even if the rule of descent at common law governs, conveyed no title whatever as against the husband or any heir at law of the allottee of the premises. Such deed is void if executed prior to July 28th 1867. Ottawa Treaty 1862, art. 7, 12 Stat. at Large, 1240.

*John W. Deford*, for defendant in error:

1. The transcript presents no question which this court can consider. The court cannot review the findings of fact and law in the journal entry. It does not appear that either party requested the court to make them "with a view of excepting to the decision," (Code, § 290.) They were not prepared with a view to an exception, and none was taken. 12 Ohio St., 7.

No exception was taken to the conclusions of law, and the plaintiff is therefore presumed to have acquiesced in their soundness. 32 Ind., 198; 25 Ind., 516. Nor can the want of such exception be supplied by a motion for a new trial either under subdiv. 6 (unless the whole case, evidence and all, is brought before this court,) or subdiv. 8 of § 306 of the code.

But these "special findings" are no part of the record. They are neither authenticated by the signature of the judge, nor embodied in a bill of exceptions. "A special finding must be in writing so that an exception may be taken, and it must be filed with the clerk so that he can enter the special finding, and the exception to it, of record. *And as evidence of its genuineness to the appellate court, it should be signed by the judge, or incorporated in a bill of exceptions signed by him."*

22 Ind., 86; 19 Ind., 130. The transcript does not even show that the judge signed the "journal," thus indirectly authenticating these findings; but if it did, it would be of no avail, as there is no law requiring him to sign the journal. He might just as well have signed the judgment on the execution docket. (Nash Pl. and Pr., 723.) The only one the judge is required to sign is the final record. Code, §§ 415, 416, and see §§ 703, 705.

2. The motion for a new trial is open to the same objection. It is not authenticated in any way. It should have been incorporated in a bill of exceptions. "A motion is no part of the record, and it can only be made so by incorporating it into a bill of exceptions." 10 Mo., 459; 31 Mo., 256. In those states, such as Iowa and Indiana, in which a motion for a new trial has been held part of the record, it has been made so by special statutes. In Kansas there is no such law. The code, § 309, provides that the application for a new trial shall be by motion upon written grounds, and filed, but it nowhere makes it a part of the record. (See § 417.)

But assuming that the motion for a new trial is part of the record, still it can raise no question before this court. Its first ground, that "the verdict is not sustained by sufficient evidence," cannot be regarded, as there is no evidence preserved in the transcript. And its second clause, that "the verdict is contrary to law," is in the same predicament. The motion is under subdiv. 6 of § 306 of the code, and therefore can raise no question here, because the whole case, evidence and all, is not before this court. 10 Ohio St., 223; 19 id., 375, 384.

3. But assuming that the record is in a condition to admit of a review by this court, does it show the judgment to be erroneous? [Counsel states the facts, and cites certain Indian treaties and U. S. statutes relative to the Ottawa Indians, (see opinion of the court,) and continues:] Under the provisions above cited, it seems clear that the Ottawa Reserve did not become subject to the laws of Kansas until July 16, 1869. Prior to that time what law governed the descent of their real estate? The district court found that it was "the common

law," and that "Shosh-qua-je-wan having died without issue, no estate by the curtesy was created, and the land in question descended to her brother David." In the absence of the evidence, the presumption is that all the inferior court's findings were fully sustained by the proofs. For the Ottawa law of inheritance was, like that of a foreign nation, or sister state —a *fact* to be found by the court below—upon the evidence. (Story's Conflict of L., §§ 637–8–9.) Indeed, in the absence of all evidence on the subject it is to be presumed that the same laws exist, in relation to husband and wife and their relative rights, throughout the civilized world as at common law. (42 Barb., 378.) And this court will take notice that the Ottawas were in 1863 a civilized people. (12 Stat. at Large, 1237.) Indian tribes are "domestic dependent nations," (5 Pet., 1,) and have in the Union the same general *status* as a territory. (18 How., 100.)

The opinion of the court was delivered by

KINGMAN, C. J.: This is an action on covenants for title. The breach alleged is a paramount outstanding title, asserted by the holder thereof, yielded to and bought in by the plaintiff. The answer is a general denial. The trial was by the court. Special findings of fact and separate conclusions of law were made by the court, which were entered upon the journal, but not signed by the judge, nor made a part of the record by bill of exceptions. The counsel for defendant in error insists that they cannot be reviewed, as they are no part of the record. This conclusion is supported by the decision in *The Peoria M. and F. Ins. Co. v. Watson*, 22 Ind., 77, cited by counsel. But we are not convinced of the soundness of this doctrine. It appears to us that they are a part of the record, and must be so treated both in this court and elsewhere. No part of the evidence appears in the record. Even the title papers are not before us. No exception appears to the findings. The plaintiff, who is also plaintiff in error, made a motion for a new trial, and the refusal to grant that motion was excepted to, and that exception presents the only question for

11—10 KAS.

our consideration. This motion the counsel for defendant in error insists is not before this court, as it is not made a part of the record by bill of exceptions. Nor was it necessary. The motion was by law in writing. It must be filed, and it became as much a part of the record as the pleadings; and the refusal to grant the motion could be excepted to on the record, as required by our code.

The overruling of the motion for a new trial is then before us. Whatever error was committed by the court in its action on that motion we can review, and correct. The motion was based on two grounds, viz., "1st, That the verdict is not sustained by sufficient evidence; 2d, That the verdict is contrary to law." The first part may be laid out of the case without comment. In the entire absence of the evidence this court cannot say whether the facts found are sustained by the testimony or not. The second cause for a new trial presents more difficulty. The word "verdict," as it is used in law, is not applicable to the findings of fact by the court. The code does not use the word in that sense; but uses it to express the report of the jury on the evidence submitted to them, while it uses an entirely different phraseology to express the report of the court on the evidence. But while the word is inaptly chosen for the purpose, it sufficiently indicates the object of the motion to be understood, and will be so treated. We shall consider it as a motion to grant a new trial because the court erred in the conclusions of law drawn from the facts found, as this is the question argued here, and the only one probably presented to the court below. The facts necessary to an understanding of the case are substantially as follows: In the year 1862 Shosh-qua-je-wan, an Indian woman, a member of the Ottawa tribe of Blanchard's Fork and Roche-de-Boeuf, intermarried with Alfred McKoonse, also an Indian, of the united bands of Chippewa and Muncie, or Christian Indians. The marriage was solemnized on the reserve of said bands, in Franklin county, by a Moravian missionary. The couple lived together thereafter two or three weeks, and then separated forever. Shortly

after their separation the land in question, which is in the
Ottawa reserve, in Franklin county, was allotted to Shosh-
qua-je-wan under and by virtue of art. 3 of the treaty of
1862 between the Ottawas and the U. S., (12 Stat. at Large,
1238.)   There was no issue of the marriage.   And in 1863
Shosh-qua-je-wan died, leaving surviving her Alfred, her
husband, and as her next of kin, Ko-to-qua, a sister, and
David McNab, a brother.   Soon afterwards Ko-to-qua like-
wise died, leaving David the sole remaining blood relative
of Shosh-qua-je-wan.   David, (who has himself since died,
leaving neither wife nor issue, nor any other "kin or kith"
so far as known,) conveyed the land in June 1867 to one
Randall, who in June 1868 sold and delivered possession of
it to the defendant Allen, who in March 1870 deeded it to
the plaintiff, and put him in possession.   Alfred, the husband,
"quit-claimed" the same premises to W. H. Sears on Sep-
tember 5th 1870, to whose title plaintiff yielded, bought it in
on December 31st, 1870, and then brought this action on the
covenants set forth in his petition.

Now upon these facts, which is the paramount title?   Or,
in other words, who was the heir-at-law of Shosh-qua-je-wan,
Alfred, the husband, or David, her brother?   The solution
of this new problem depends of course upon the answer to
the further question: What was the law of descent, or rule
of inheritance, in force in the Ottawa reserve, when the
descent from Shosh-qua-je-wan was cast, in 1863?   By art. 9,
of the treaty of 1831 between the U. S. and the Ottawas, the
United States guarantee that the reserve of the Ottawas
shall never be within the bounds of any state or territory,
nor subject to the laws thereof. 7 Stat. at Large, 361.   See
also act of admission, § 1, Gen. Stat., 67.   In this status the
land remained till the treaty of July 16th, 1862, (12 Stat.
at Large, 1237.)   In this treaty there is no express repeal of
the agreement that the lands should not become a part of
the state, but the whole tenor of the treaty is to that effect.
The object of the treaty seems to be to make a final disposi-
tion of the lands of the tribe, and dissolve the tribal relation.

The treaty stipulates that at the expiration of five years, the members of the tribe shall become citizens of the United States, and their tribal relations cease. Meantime their lands are to be disposed of by special allotments and sales in various ways. Some of the stipulations of the treaty are absolutely inconsistent with the idea that the reservation is without the limits of the state, while others seem clearly to recognize the laws of Kansas as in force from that time forward. As examples we may cite the following: Certain lands shall not be taxable until they are sold; (art 6.) Certain lands are to be set apart for the benefit of the Ottawa Baptist Church, the title to be vested in a board of trustees, to be appointed by said church, in accordance with the laws of Kansas; (art. 7.) Members of the tribe not under legal disabilities by *the local laws* may sell to each other certain lands under certain circumstances; (art. 7.) The money of minors may be paid to guardians appointed by the local laws; (art. 8.) After location made the sales of the residue of land is to be made to actual settlers only; (art. 9.) These instances might be multiplied; but enough are suggested to show the intention of the parties to the treaty to abrogate that provision of the treaty of 1831 which stipulates that the reservation of the Ottawas shall not be a part of any state or territory. The land is all covered by white settlers having the benefit of our laws, and bearing the burdens of the government; and yet there is no express change in the stipulation of the treaty of 1831. It is undoubtedly abrogated, and we think it may fairly and justly be considered as abrogated by the terms of the treaty of 1862, and that from that date the jurisdiction of the state of Kansas extended over the reservation. If not, what code of laws governed the white settlers expressly provided for by art. 7? Were they also a nation to themselves? The terms ought to be susceptible of no other construction before a court could be driven to such a conclusion.

If the reserve did not by virtue of the provisions of the treaty of 1862 become a part of this state, it is not now a part of it. The making of the tribe citizens after five years

did not necessarily in terms make the reserve a part of the state, though it must be admitted as one of many stipulations in the treaty abrogating the excluding-clause of the treaty of 1831. But it cannot be strained into a stipulation that after five years the excluding-clause of the treaty shall be abrogated. Take the whole treaty together, and we are satisfied that so many of its provisions recognize the land as a part of the state, that it must be held that the parties thereto intended to remove the excluding-clause of the treaty of 1831. This being so, the laws of Kansas formed the law of descent at the death of the patentee in 1863, and that law must govern the decision of this case. The court below came to a different conclusion as to the law of descent, holding that the same was according to the common law. For this error of the district court the judgment is reversed and a new trial awarded.

All the Justices concurring.